UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| KARE DISTRIBUTION, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>JAM LABELS AND CARDS LLC, d/b/a A&M CARDS, a New Jersey limited liability company, ARTHUR AARON, an individual, and MARC STEINBERG, an individual,<br><br>Defendants. | § CIV. ACT. NO: 2:09-cv-969 (SDW)<br>§<br>§ FIRST AMENDED COMPLAINT<br>§ FOR (1) CONVERSION, (2)<br>§ REPLEVIN, (3) BREACH OF<br>§ CONTRACT, (4) UNJUST<br>§ ENRICHMENT, (5) TORTIOUS<br>§ INTERFERENCE WITH<br>§ CONTRACT; (6) BREACH OF THE<br>§ DUTY OF GOOD FAITH AND FAIR<br>§ DEALING; AND (7) FRAUD<br>§<br>§<br>§ |

Plaintiff Kare Distribution, Inc. ("Kare") hereby files this First Amended Complaint on personal knowledge as to its own activities and on information and belief as to the activities of others:

## THE PARTIES

1.  Plaintiff Kare is a Delaware corporation, organized and existing under the laws of Delaware, with its principal place of business at 1250 Broadway, New York, New York 10001.

2.  Defendant Jam Labels and Cards, LLC d/b/a A&M Cards ("A&M") is a New Jersey limited liability company with its principal place of business at 812 Jersey Ave, 5th floor, Jersey City, NJ 07310.

3.  Defendant Arthur Aaron ("Aaron") is a resident of the State of New Jersey, living at 5 Horizon Road, # 711, Fort Lee, New Jersey 07024.

4.  Defendant Marc Steinberg ("Steinberg") is a resident of the State of New Jersey, living in Tenafly, New Jersey.

5.  A&M, Aaron and Steinberg are collectively referred to as Defendants.

## JURISDICTION AND VENUE

6. This court has diversity jurisdiction over Kare's claims pursuant to 28 U.S.C. § 1332 in that Kare and Defendants are diverse and the amount in controversy is at least $75,000.

7. This Court has personal jurisdiction over Defendants in that Defendants reside in and do business throughout the State of New Jersey including this District. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400(a) because a substantial part of the acts or omissions giving rise to Kare's claims occurred in this district and because Defendants are subject to personal jurisdiction in this district.

## FACTUAL BACKGROUND

### A. Kare's Prepaid Phone Card Business

8. Kare is the direct distribution arm of Epana Networks, Inc. ("Epana"), a provider of prepaid phone cards. Epana has developed low-cost voice over internet protocol (VoIP) solutions, and has invested more than $20,000,000 in its VoIP network. Epana entered the international phone card business in 2002.

9. Prepaid phone card providers typically relied on third-party distributors to sell their prepaid phone cards to retailers such as markets, bodegas and liquor stores, who would in turn sell the cards to end-consumers. Realizing there was a void in direct distribution channels, Epana set up Kare to build a Direct Store Distribution network ("DSD").

10. Kare, by itself and through its affiliated companies, including Epana, invested tens of millions of dollars setting up the DSD network, including hiring its own sales and marketing personnel across the United States. By delivering directly to retailers, Kare is able to save substantial costs, which can be passed on to its customers. Simultaneously, Kare is able to cultivate relationships with local retailers, which, in turn, has opened the door for Kare's community-based marketing efforts.

11. With Kare's significant investment in its DSD network came the desire to have more permanent relationships with consumers. Historically, the prepaid phone card industry

2

relied on "fighter" brands, i.e. cards launched under a name or trademark that would have a six to twelve month life cycle. Kare, by contrast, has launched and invested heavily in "flagship" brands, such as DIGAME and MI CARNAL. Kare invests tens of millions of dollars in marketing and brand development for its flagship brands so that consumers know that they will receive quality services at consistent prices for cards sold under these trademarks.

12. Kare reinforces customer loyalty to these brands through various existing and past loyalty programs, including its Bienestar loyalty program, where consumers earn points as with the airline industry and can redeem them for free minutes; its HealthTrans loyalty program where customers obtain discounts at local pharmacies for medicine; and the Digame Plan 30, a monthly fee product that offers unlimited minutes to a single destination. Additionally, Kare sends "brand ambassadors" to local events such as soccer matches with free giveaways and other promotions to spread goodwill among the communities that Kare serves.

13. Kare also makes substantial investments of time and money in developing its relationships with the retailers who sell Kare's phone cards. By cultivating these relationships, Kare further strengthens its market position and gains invaluable business intelligence as to consumer preferences, buying patterns and market trends.

**B.     Kare's Relationship with A&M Cards**

14. A&M offers printing services. A&M is not in the business of storing goods or providing warehouse services.

15. Kare has used A&M's printing services for approximately five years. The parties have never had a formal written agreement at any point in their relationship. The parties' course of dealings and communications with each other over that time are the best evidence of the scope and nature of their relationship.

16. Kare ordered cards from A&M by sending A&M a purchase order, to which A&M would respond with an invoice. Kare took ownership of the cards that A&M printed for Kare upon receipt of payment for the corresponding invoice by A&M.

17. Kare and A&M never had a minimum obligation of number of cards that Kare had to order to obtain the prices that A&M was providing. Similarly, Kare and A&M never had an exclusivity arrangement.

18. Historically, A&M always provided Kare with picking, packing, shrink-wrapping and palletizing services ("Packing Services") as part of A&M's printing fees, without separate or additional charges for these Services.

19. In or about September 2008, Kare placed a new individual in charge of its relationship with A&M, Jay Adams ("Adams"). Adams assessed A&M's pricing and performance, and learned that A&M was charging rates significantly higher than market and had serious quality issues with its printing services, including but not limited to:

- A&M does not provide online access for ordering, shipping and tracking, features offered by many of A&M's competitors.
- A&M was charging for shipping services even though other printers offer shipping for free. By charging shipping, A&M increased Kare's printing costs by an additional $35,000 to $55,000 per month.
- A&M printed on 10 point paper even though industry standard is 12 point paper, which is thicker and higher quality. A&M justified the use of 10 point paper by the fact that that 10 point paper weighs less and would lower Kare's shipping costs. However, other printers who offer free shipping print on 12 point paper.

20. A&M's pricing is also much higher than its competitors. A&M charged Kare $0.034 per card regardless of size while other vendors charge between $0.028 to $0.030 per card for large cards and between $0.024 and $0.025 per card for smaller sizes. A&M also charged Kare plate fees and other one-time fees that its competitors do not charge.

**C.    A&M's Serious Quality Control Failings**

21. In addition to charging Kare more than market rates and not offering services offered by its competitors, A&M began having serious quality control problems.

22. For example, one of Kare's core cards launched in 2008 was the El Chavo brand card. El Chavo is a very popular Mexican television show owned by Televisa S.A. de C.V., to whom Kare pays a licensing fee for use of the El Chavo trademark.

23. When Kare received the El Chavo cards from A&M, the quality was horrendous. There was black spotting throughout the card and colors running into each other. Aaron dismissed the quality problem as a non-issue and that the El Chavo cards were just "cards sold to Mexicans and not art." Aaron further blamed the issue on a supposed "vendetta" against Steinberg.

24. Kare also advised A&M that the El Chavo cards actually printed by A&M did not match the proof card that A&M provided to Kare prior to printing. A&M again denied the existence of any issue and had one of their employees bring the proof back for further inspection. Only thereafter did A&M concede that the quality of the printed cards did not match the proof.

25. At a subsequent meeting to discuss the quality control issue, Steinberg admitted to the quality issues, after which Aaron conceded that A&M's press is not capable of printing with the requisite quality and referred Kare to a competitor. Kare was ultimately forced to move the job to a third party, Legend Print and Design, Inc.

26. A&M also failed to properly print Kare's Astral brand card, specifically failing to print the card in the colors requested by Kare. Kare was forced to move this job to Allstate Printing Packaging, Inc.

**D.  Kare's Attempt to Renegotiate the Terms of the Parties' Arrangement**

27. In light of A&M's high prices, failure to offer basic services and failure to adequately perform the services it did provide, Kare decided to shift a sizeable portion of its business to other printers. Kare did believe that it could continue to use A&M for certain, limited jobs, and sought to renegotiate the terms of its arrangement with A&M in connection therewith.

28. Kare sent A&M a draft written agreement for consideration, which A&M rejected wholesale. A&M never responded to any of the proposed contract provisions in any detail, advising only in the postscript to an email several days later that the draft was "unacceptable."

29. While A&M would not discuss a formal, written agreement, A&M did agree to certain deal points. A&M agreed to provide Kare with free shipping in order to keep Kare's business.

30. A&M's agreement not to charge for shipping was not conditioned on minimum printing requirements.

31. A&M's subsequent invoices still included shipping charges using Kare's UPS shipping number. When Kare confronted A&M about the charges, Steinberg stated that he would not honor the agreement on free shipping unless there was a minimum shipment quantity.

32. When the parties reached their agreement on free shipping, A&M had not before suggested that the agreement on free shipping would require minimum shipping amounts, and Kare never agreed thereto. A&M's subsequent use of Kare's UPS number for shipping was unauthorized and in violation of the parties' agreement.

### E. A&M's Conversion of Kare Phone Cards and Attempts to Charge Unwarranted Fees

33. A&M reacted to Kare's shift of business to other printers by trying to impose upon Kare a series of backdated charges for storage fees and shipping costs totaling $63,746.

34. A&M has attempted to justify these backdated charges because of Kare's alleged failure to meet "minimum" printing requirements. However, despite repeated requests from Kare, A&M is unable to produce any communications or other evidence of prior dealings where the parties agreed to minimum printing requirements.

35. Defendants are currently in possession of 11,567,500 prepaid phone cards printed for Kare (the "Inventory") located at 812 Jersey Ave, 5th floor, Jersey City, NJ 07310 (the "Location").

36. Kare has paid for the Inventory in full.

37. Kare has requested return of the Inventory, but Defendants have refused Kare's request and have stated that they will not release the Inventory unless Kare agrees to pay for the backdated shipping and storage fees, as well as additional fees for Packing Services.

38. The total retail value of the cards that Defendants refuse to release is $48,820,500. The total amount of the disputed invoices for all of the improper, backdated fees that A&M has attempted to impose is $63,746.

39. Not only have Defendants refused to return the Inventory to Kare, Defendants are refusing to ship any portion of the Inventory to Kare's retailers pending resolution of this dispute. Defendants' refusal to ship Kare's cards to retailers ensures that the cards will not be available to consumers for purchase.

40. Defendants only dispute with Kare is over specific, limited invoices and fees, which dispute does not entitle Defendants to withhold inventory worth millions of dollars more than the total amount of disputed fees. Moreover, of the 11,567,500 cards in Defendants' possession, approximately 5,000,000 are for Kare's flagship brands in which Kare has invested millions of dollars in marketing and brand development. If these cards are not on the market, Kare will suffer damage to the goodwill associated therewith.

41. Kare has put Defendants on notice of the irreparable damage that Kare is suffering as a result of Defendants' refusal to return the Inventory to Kare on multiple occasions.

42. Defendants conceded in writing that:

- The Inventory is "[Kare's] finished product";
- The "immediate issue" is "returning that product to [Kare]"; and
- Defendants "recognize[] the need to return the finished product to [Kare] now."

43. Nevertheless, Defendants are refusing to return the Inventory unless Kare first pays invoices which Kare disputes, as well an additional payment for Packing Services. Thus, A&M is not just breaching their obligations under the parties' agreement, all the Defendants are

7

using the withholding of nearly $50,000,000 worth of inventory as leverage over Kare to secure payment of the disputed invoices and additional fees.

**F.    Defendants' Intentional Acts of Fraud**

44.    Defendants intentionally defrauded Kare by sending Kare invoices for third party services that were not incurred. For example, A&M charged Kare $6,529 for shredding services provided by American Shredder. American Shredder only charged A&M $1,177 those same shredding services. Defendants simply added nearly $5,500 to the invoice without basis or justification, which Kare paid in good faith reliance on A&M's representation that the invoice was accurate. Notably, Defendants did not even pay the $1,177 to American Shredder, and simply kept all of Kare's monies.

**FIRST CLAIM FOR RELIEF**

**(Conversion as to all Defendants)**

45.    Kare repeats and realleges the preceding paragraphs of this Complaint as if fully set forth herein.

46.    Kare paid all invoices sent by A&M for the Inventory. The Inventory lawfully belongs to Kare, and Defendants have no legal right, title or interest therein.

47.    Defendants' belated attempt to charge Kare for storage of the Inventory confirms that Kare is the lawful owner of all right, title and interest in the Inventory.

48.    As set forth above, despite repeated notices from Kare about the ongoing damage that it is incurring on a daily basis, Defendants have refused to return the Inventory.

49.    Defendants are using the Inventory as leverage to secure payments to which they are not entitled.

50.    Such course of conduct constitutes conversion of the Inventory, which is owned by Kare.

51.    Kare is entitled to immediate possession of the Inventory wrongfully converted by Defendants.

52. As a direct and proximate result of the Defendants' conversion of the Inventory, Kare has suffered actual and consequential damages in an amount to be determined at trial.

53. Defendants' actions were willful, intentional and malicious and entitle Kare to punitive damages.

54. Defendants' conduct has caused irreparable injury to Kare, and will continue to cause irreparable injury to Kare unless Defendants are ordered to return the Inventory to Kare.

## SECOND CLAIM OF RELIEF

### (Replevin as to A&M)

55. Kare repeats and realleges the preceding paragraphs of this Complaint as if fully set forth herein.

56. Kare has paid all invoices for the Inventory.

57. Pursuant to the parties' agreement and course of dealing, Kare is entitled to immediate possession of the Inventory.

58. Kare has alerted Defendants as to its right to the Inventory, but Defendants have refused to permit Kare to take possession of the Inventory.

59. Defendants' belated attempt to charge Kare for storage of the Inventory confirms that Kare is the lawful owner of all right, title and interest in the Inventory.

60. The Inventory is comprised of 11,567,500 prepaid phone cards.

61. Defendants have wrongfully retained the Inventory in derogation of Kare's superior possessory interest.

62. Defendants' conduct has caused irreparable injury to Kare, and will continue to cause irreparable injury to Kare unless Defendants are ordered to return the Inventory to Kare.

## THIRD CLAIM FOR RELIEF

### (Breach of Contract as to Defendant A&M)

63. Kare repeats and realleges the preceding paragraphs as if fully set forth herein.

64. Kare and A&M entered into a valid agreement, supported by offer, acceptance and adequate consideration.

65. Kare performed all of its obligations under the agreement, except those for which it was excused from performing, if any.

66. As set forth above, A&M has breached the agreement, by including but not limited to, printing materials of unacceptable quality, continuing to use Kare's UPS shipping number, and refusing to deliver the Inventory to Kare.

67. As a direct and foreseeable result thereof, Kare is entitled to actual and consequential damages in an amount to be proven at trial.

68. Kare is entitled to specific performance obligating A&M to return the Inventory to Kare.

## FOURTH CLAIM FOR RELIEF

### (Unjust Enrichment as to all Defendants)

69. Kare repeats and realleges the preceding paragraphs as if fully set forth herein.

70. Defendants have benefited by their unlawful retention of the Inventory, with a retail value of $48,820,500.

71. Defendants have been wrongfully enriched from the benefit described above.

72. Defendants' wrongful enrichment is at Kare's expense, as Kare is the lawful owner of the Inventory.

73. Equity and justice require that Defendants not be permitted to retain the benefit conferred thereon without adequately compensating Kare.

## FIFTH CLAIM FOR RELIEF

### (Tortious Interference with Contract as to all Defendants)

74. Kare repeats and realleges the preceding paragraphs as if fully set forth herein.

75. Kare has valid business relationships with the retailers who sell Kare's prepaid phone cards.

76. Defendants have knowledge of Kare's business relationships with its retailers.

77. Defendants have wrongfully interfered with those business relationships through dishonest, unfair and/or improper means by refusing to return or ship the Inventory.

78. As a direct and proximate result of Defendants' tortious interference, Kare has lost or will lose business relationships with its retailers. This loss has caused or will cause Kare to suffer damages in an amount to be proven at trial.

79. Defendants' tortious interference has caused and, unless restrained by this Court, will continue to cause irreparable injury to Kare.

80. Defendants' actions were willful, intentional and malicious and entitle Kare to punitive damages.

## SIXTH CLAIM FOR RELIEF

### (Breach of the Duty of Good Faith and Fair Dealing as to Defendant A&M)

81. Kare repeats and realleges the preceding paragraphs as if fully set forth herein.

82. Kare and A&M's agreement contained an implied covenant of good faith and fair dealing, providing that neither party would act to deprive the other of the benefit of their agreement.

83. A&M breached the duty of good faith and fair dealing by its acts as described above.

84. As a direct and proximate result thereof, Kare has suffered actual and consequential damages in an amount to be determined at trial.

## SEVENTH CLAIM FOR RELIEF

### (Fraud as to all Defendants)

85. Kare repeats and realleges the preceding paragraphs as if fully set forth herein.

86. Defendants misrepresented the amount of at least the American Shredder invoice to Kare.

87.  Kare reasonably relied on Defendants' misrepresentations in paying Defendants' invoice for American Shredder's services.

88.  Defendants made their misrepresentations willfully and intentionally, and in an effort to deceive Kare.

89.  Kare was deceived and would not have paid the invoice that Defendants submitted to Kare had Kare known the actual amount of the American Shredder invoice.

90.  Kare has been damaged in the an amount to be proven at trial as a result of Defendants' misrepresentations to Kare.

91.  Defendants' actions were willful, intentional and malicious and entitle Kare to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Kare prays for the following relief against Defendants:

1.  That the Court issue a pre-judgment Writ of Replevin authorizing Kare, with assistance, if necessary, of the U.S. Marshal or another federal, state or local law enforcement agency, to take possession of the Inventory;

2.  That Defendants be ordered to specifically perform under the parties' agreement by immediately permitting Kare or its agents to take possession of all of the Inventory from Location, including but not limited to accessing the Location, turning on the lights in the Location, packing the Inventory and removing the Inventory from the Location;

3.  For an award of actual, consequential and punitive damages sustained by Kare;

4.  For an award of Kare's costs and attorneys' fees;

5.  For prejudgment interest as permitted by law; and

6.  For such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Kare hereby demands a jury trial on all triable issues raised by this Complaint.

Respectfully submitted,

DATED: March 24, 2009

GREENBERG TRAURIG, LLP

By: /s/ Roger B. Kaplan

Roger B. Kaplan (RK 6985)
GREENBERG TRAURIG
200 Park Avenue
Florham Park, New Jersey 07932
Tel: (973) 360-7900
Fax: (973) 295-1258

David Saenz (DS 1976) (*pro hac vice* application pending)
200 Park Avenue
New York, New York 10166
Tel: (212) 801-9200
Fax: (212) 801-6400

*Attorneys for Plaintiff*
*Kare Distribution, Inc.*