NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| KARE DISTRIBUTION, INC., | : | |
| | : | Civil Action No. 09-00969 (SDW) |
| Plaintiff, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| JAM LABELS AND CARDS LLC d/b/a | : | |
| A&M CARDS, ARTHUR AARON and | : | October 8, 2009 |
| MARC STEINBERG, | : | |
| | : | |
| Defendants. | : | |
| | : | |

**WIGENTON**, District Judge.

Before the Court are two separate Motions to Dismiss pursuant to Federal Rules of Civil Procedure 12(b) and 12(c). Plaintiff/Counterdefendant Kare Distribution, Inc. ("Kare" or "Plaintiff") moves to dismiss Defendants/Counterclaimants Jam Labels and Cards LLC d/b/a A&M Cards ("A&M Cards"), Arthur Aaron ("Aaron") and Marc Steinberg's ("Steinberg") (collectively, "A&M" or "Defendants") counterclaims for (1) Fraudulent Inducement, (2) Violation of the New Jersey Consumer Fraud Act and (3) Economic Duress, and to strike Aaron and Steinberg (collectively, the "Individual Defendants" ) as counterclaimants from all Counts. Defendants, on the other hand, have filed a Motion to Dismiss all of Plaintiff's claims as to the Individual Defendants.[1] This Court has jurisdiction pursuant to 28 U.S.C. 1332(a). Venue is

---

[1] Defendants' motion to dismiss was improperly filed pursuant to Fed. R. Civ. P. 12(b)(6) after the complaint was answered. "A Rule 12(b) motion to dismiss a complaint must be filed before any responsive pleading. A Rule 12(c) motion for judgment on the pleadings may be filed after the pleadings are closed." *Turbe v. Gov't of Virgin Islands*, 938 F.2d 427, 428 (3d Cir. 1991). However, "[s]ince the Rule 12(c) motion serves the same function as the untimely motion under Rule 12(b)(6), numerous courts faced with 'a misnamed motion to dismiss have chosen to overlook the semantic faux pas and restyled the motion as a Rule 12(c) motion'. . . ." *Tr. of the Univ. of Pa. v. Mayflower Transit*, No. 97-1111, 1997 WL 598001, at *2 (E.D. Pa. Sept. 16, 1997) quoting *Delta Truck & Tractor, Inc. v.*

proper pursuant to 28 U.S.C. § 1391. The Motions are decided without oral argument pursuant to Federal Rule of Civil Procedure 78.[2]

## FACTUAL AND PROCEDURAL BACKGROUND

Kare is the direct distributor of prepaid phone cards provided by its parent company, Epana Networks, Inc. ("Epana"). (Pl.'s First Am. Compl. ¶ 8 (hereinafter "Am. Compl.").) Epana entered the international phone card business in 2002. (*Id*.) In or about 2004, Aaron and Steinberg formed A&M to provide "small-sized" printing services. (Defs.' Answer and Countercl. ¶ 10 (hereinafter "Defs.' Countercl.").) For that purpose, A&M entered into a contractual relationship with a small printing company in Pennsylvania, whereby A&M acted as a broker and subcontracted the printing orders they received from their customers. (*Id*. ¶¶ 10, 11.)

In or about late 2004 or early 2005, Kare and A&M entered into an oral agreement in which A&M agreed to print Kare's cards. (Defs.' Countercl. ¶ 20.) The parties never entered into a formal written agreement; however, the nature of their relationship is evidenced by their course of dealings and communications. (Am. Compl. ¶ 15; Defs.' Countercl. ¶ 20.) Kare ordered cards from A&M by sending A&M a purchase order, to which A&M would respond with an invoice. (Am. Compl. ¶ 16.) Kare took ownership of the cards upon receipt of payment for the corresponding invoice by A&M. (*Id*.)

By early 2006, Kare's market share and business operations had increased significantly (Defs.' Countercl. ¶ 22.) As a result, A&M alleges that Kare, on two separate occasions, advised

---

*Navistar Int'l. Transp. Corp.*, 833 F. Supp. 587, 588 (W.D. La. 1993). Defendants' motion, therefore, will be considered under 12(c).

[2] In the preliminary statement of Defs.' Mem. of Law in Supp. of Mot. to Dismiss ("Defs.' Br."), Defendants suggest that Plaintiff's claims for fraud, unjust enrichment and replevin should be dismissed. (Defs.' Br. 1.) Defendants, however, do not cite to any authority nor provide any legal arguments to support their position. Consequently, the Court will not address or consider those arguments.

A&M that it would be unable to continue utilizing A&M as Kare's printer unless A&M increased their printing capacity. (Defs.' Countercl. ¶¶ 23, 28.) The first occurred in 2006 when Kare required that A&M purchase or lease printing equipment sufficient to service Kare's needs. (*Id*. ¶ 23.) In return, A&M alleges that Kare promised to utilize A&M for all of Kare's printing needs (to the extent A&M's new capacity allowed). (*Id*.) A&M also alleges that, based exclusively on Kare's promises, A&M leased additional printing equipment totaling over $750,000. (*Id*. ¶ 25.) The second occasion transpired in 2007 when Kare allegedly informed A&M that it required more space to warehouse its cards (after printing but pre-shipping). (*Id*. ¶ 28.) Consequently, Kare requested that A&M lease a significantly larger facility for its printing and storage operations or Kare would no longer be able to do business with A&M. (*Id*. ¶ 30.) Additionally, A&M alleges that Kare promised A&M that if it consented to Kare's request, Kare would continue to use A&M for all of its printing needs and that any long-term leasehold expenses, incurred by A&M, would be more than covered by the increased volume in A&M's business. (*Id*.) Accordingly, in or about May 2007, A&M leased a new 28,500 sq. ft. facility in Jersey City, New Jersey, memorialized by a five (5) year lease terminating in May 2012. (*Id*. ¶ 31.) Consistent with both of Kare's alleged promises, in 2006 and 2007, it is undisputed that Kare continued to use and increase A&M's business by sending them virtually all of their printing business. (*Id*.)

In or about August 2008, Kare restructured its management team due to the loss of several executives and, in September 2008, placed Jay Adams ("Adams") in charge of its relationship with A&M. (Am. Compl. ¶ 19; Defs.' Countercl. ¶ 34.) After reviewing A&M's pricing, Adams concluded that Kare could negotiate a better rate. (Am. Compl. ¶ 19; Defs.' Countercl. ¶ 36.) Consequently, Kare advised A&M that A&M would have to reduce its costs,

3

among other things, in order to continue their business relationship. (Am. Compl. ¶ 27; Defs.' Countercl. ¶ 37.) Ultimately, after a period of negotiation during which the parties continued their business relationship, Kare and A&M were unable to reach a final agreement regarding A&M's pricing (Am. Compl. ¶ 31-32; Defs.' Countercl. ¶ 39.) Kare immediately requested the return of all warehoused cards. (Am. Compl. ¶ 37; Defs.' Countercl. ¶ 40.) A&M refused. (Am. Compl. ¶ 37.) Accordingly, on March 4, 2009, Kare initiated this action. On March 24, 2009, Kare filed its First Amended Complaint ("FAC"), seeking damages for (1) Conversion, (2) Replevin, (3) Breach of Contract, (4) Unjust Enrichment, (5) Tortious Interference with Contract, (6) Breach of the Duty of Good Faith and Fair Dealing, and (7) Fraud. On May 15, 2009, Defendants answered the FAC and filed Counterclaims for (1) Estoppel, (2) Breach of Contract, (3) Breach of the Duty of Good Faith and Fair Dealing, (4) Economic Duress, (5) Fraudulent Inducement, and (6) Violation of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1 *et seq*.

## MOTION TO DISMISS STANDARD

The adequacy of pleadings is governed by Fed. R. Civ. P. 8(a)(2), which requires that a complaint allege "a short and plain statement of the claim showing that the pleader is entitled to relief." This Rule "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted); *Phillips v. County of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008) (Rule 8 "requires a 'showing' rather than a blanket assertion of an entitlement to relief.").

In considering a Motion to Dismiss under Fed. R. Civ. P. 12(b)(6), the Court must "'accept all factual allegations as true, construe the complaint in the light most favorable to the

Plaintiff, and determine whether, under any reasonable reading of the complaint, the Plaintiff may be entitled to relief."' *Phillips v. County of Allegheny,* 515 F.3d 224, 231 (3d Cir. 2008) (quoting *Pinker v. Roche Holding Ltd.,* 292 F.3d 361, 374 n.7 (3d Cir. 2002)).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. at 555).  As the Supreme Court has explained:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of "entitlement to relief.""

*Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 556–57, 570) (internal citations omitted).  Determining whether the allegations in a complaint are "plausible" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 129 S. Ct. 1937 at 1950.  If the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," *Id.* at 1950, the complaint should be dismissed for failing to "show[] that the pleader is entitled to relief" as required by Rule 8(a)(2).

To the extent that Defendants' motion is to be considered under Fed. R. Civ. P. 12(c), our courts have noted that "a motion to dismiss for failure to state a claim under Rule 12(c) is identical to one filed under Rule 12(b)(6), except Rule 12(c) allows for the motion to be filed

5

after the filing of an answer, while Rule 12(b)(6) allows for the motion to be made in lieu of an answer." *Wellness Pub. v. Barefoot*, No. 02-3773, 2008 WL 108889, at * 6 (D.N.J. Jan. 9, 2008); *see also* Fed. R. Civ. P. 12(h)(2)(B). In either instance, a court is to use the same standard in evaluating the motions. *Reinbold v. U.S. Post Office*, 250 Fed. Appx. 465, 466 (3d Cir. 2007) (citing *Turbe v. Gov't of Virgin Islands*, 938 F.2d 427, 428 (3d Cir. 1991)).

## DISCUSSION

Kare moves to dismiss A&M's counterclaims for (1) Fraudulent Inducement, (2) Violation of the New Jersey Consumer Fraud Act and (3) Economic Duress, and to strike the Individual Defendants as counterclaimants. Plaintiff asserts that Defendants' allegations, even if taken as true, not only fail to support the counterclaims relevant to the pending motion to dismiss but actually contradict them. Furthermore, Plaintiff argues that A&M, as the seller of services, does not have standing to bring a claim under the New Jersey Consumer Fraud Act. Finally, Plaintiffs argue that the Individual Defendants are improperly included as counterclaimants because there are no allegations that Aaron or Steinberg contracted personally with Kare or incurred any personal obligations to them. Defendants, on the other hand, seek to dismiss all of Plaintiff's claims as to the Individual Defendants because Plaintiff does not identify any specific misconduct by Aaron and Steinberg or set forth any factual allegations that justify piercing the corporate veil.

I. **Plaintiff's Motion to Dismiss**

    A. **Fraudulent Inducement**

The standard for establishing a claim of common law fraud, fraudulent misrepresentation, and fraudulent inducement under New Jersey law is the same: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an

intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Banco Popular N. Am. v. Gandi,* 184 N.J. 161, 172-73 (2005) (quoting *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 610 (1997)); *see also Jewish Center of Sussex County v. Whale,* 86 N.J. 619, 624-25 (1981).

Additionally, a claim for fraudulent inducement must meet the requirements of Fed R. Civ. P. 9(b) which imposes a heightened pleading requirement with respect to allegations of fraud, over and above that required by Rule 8(a). Rule 9(b) states "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "Plaintiffs may satisfy this requirement by pleading the 'date, place or time' of the fraud, or through 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'" *Lum v. Bank of Am.*, 361 F.3d 217, 224 (3d Cir. 2004) (quoting *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984)). "Plaintiffs also must allege who made a misrepresentation to whom and the general content of the misrepresentation." *Id*. Although Kare disputes A&M's factual allegations, Kare argues, among other things, that even if the allegations were true, A&M's claim for fraudulent inducement fails because A&M cannot establish the elements of knowledge of falsity or scienter at the time of contracting. The Court agrees.

A&M's own allegations preclude a claim for fraud. A&M's allegations of fraud stem from two separate instances in which Kare advised A&M that it could no longer serve as Kare's printer unless A&M increased its printing capacity. In the first instance, in 2006, Kare promised to give A&M "all the business they could handle" if A&M leased additional printing presses and equipment. (Defs.' Countercl. ¶ 24.) In the second instance, in 2007, Kare requested that A&M obtain additional warehouse space, and in return Kare promised that any long term lease expense

7

would be covered by the increased volume in A&M's business. (*Id.* ¶ 30.) In neither instance does A&M claim that at the time of the alleged promises Kare knew their representations were false. To the contrary, according to A&M, from 2004 until August 2008, "consistent with their promises and representations," Kare sent A&M "virtually all of Kare's printing business." (*Id.* ¶¶ 25, 33.) Thus, Kare and A&M continued their business arrangement for as many as five years. (Am. Compl. ¶ 15; Defs.' Countercl.) It was not until sometime after February 2009, when "A&M advised [Kare] that it could not continue to operate pursuant to the proposed price structure" negotiated by Kare's new management team, that Kare terminated the relationship and demanded the return of its warehoused cards. (Defs.' Countercl. ¶ 39, 40.) Here, A&M's allegations fail to meet even the liberal standard applied to Fed. R. Civ. P. 12(c) motions, let alone the heightened pleading requirements of Fed R. Civ. P. 9(b)[3]. Without specific allegations that at the time Kare and A&M entered into their contract(s), Kare knew or had reason to know its promises were false, A&M's claim for fraudulent inducement must fail. *See Banco Popular,* 184 N.J. at 173 (requiring knowledge or belief by the defendant in the falsity of the misrepresentation).

### B. New Jersey Consumer Fraud Act (N.J.C.F.A. § 56:8-1)

A&M's claim under the New Jersey Consumer Fraud Act ("NJCFA" or "Act"), N.J. Stat. Ann. § 56:8-1 *et seq.* (2009), must also fail because A&M is not a consumer or purchaser under the statute. The NJCFA provides in relevant part:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection

---

[3] A&M alleges that Kare's misrepresentations occurred "[b]y the end of 2006" and "in 2007", respectively. (Defs.' Countercl. ¶¶ 25, 28). These allegations fail to satisfy the Rule 9(b) requirement that the allegations be pled with specificity by including the date, place or time of the fraud, or through some alternative means of precision. *Lum*, 361 F.3d at 224.

> with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

N.J. Stat. Ann § 56:8-2.  The NJCFA provides a private right of action for any "person" who is harmed by such unlawful practices, N.J. Stat. Ann. § 56:8-19, and defines "person" to include, among others, "any ... corporation, company, trust, business entity or association."  § 56:8-1(d). "Merchandise" is defined to include "any objects, wares, goods commodities, services or anything offered, directly or indirectly to the public for sale."  § 56:8-1(c).  A business, however, may only seek relief under the NJCFA "when it finds itself in a consumer-oriented transaction." *Bracco Diagnostics, Inc. v. Bergen Brunswig Drug Co.*, 226 F. Supp. 2d 557, 560 (D.N.J. 2002). New Jersey courts have consistently held that a "purchaser of wholesale goods for resale are not consumers within the meaning of the NJCFA."  *Id.* at 560-61 (quoting *Lithuanian Commerce Corp. v. Sara Lee Hosiery*, 179 F.R.D. 450, 469 (D.N.J. 1998)).  Furthermore, in the context of services, "[t]he challenged services generally must be of the type sold to the general public."  *Id.* at 561.

In this case A&M is not even a purchaser of wholesale services, it is the seller. According to its counterclaim, "A&M is in the business of, among other things, providing commercial printing services."  (Defs.' Countercl. ¶ 5.)  In opposing Kare's motion to dismiss, A&M argues for an expansionary reading of the NJCFA in which it, as a seller of services, would be protected by the statute's provisions.  A&M reasons that the NJCFA was enacted to cover a broad range of fraudulent practices.  It is unambiguous, however, that the persons intended to be protected by the statute must be consumers.  It appears A&M admits as much. (*See* Defs.' Br. 12 ("the clear statutory objective [of the Act] is to protect consumers").)  But

9

A&M argues that the term "consumer" is not defined in the statute and that A&M has standing because A&M and Kare participated in a "consumer transaction." Therefore, A&M argues, it should "at a minimum be given an opportunity to engage in discovery to flush out its [NJCFA] claim." (Defs.' Br. 15.)

A&M misses the point. A&M and Kare might very well have participated in the type of "consumer transaction" meant to be protected by the statute; however, at best, *Kare* was the consumer. Nowhere in its pleading does A&M allege that it purchased or consumed goods or services from Kare, as would be required to state a claim under the NJCFA. A&M was the seller. No amount of discovery will cure that fatal defect. Furthermore, A&M fails to cite to any case law supporting the fact that a *seller* of goods or services has standing under the Act. *But see Channel Companies, Inc. v. Britton*, 167 N.J. Super. 417, 418 (App. Div. 1979) (affirming trial court's dismissal and holding that sellers do not have standing to sue under the Act); *Specialty Ins. Agency v. Walter Kaye Associates, Inc.*, No. 89-1708, 1989 WL 120752, at *5-6 (D.N.J. Oct 2, 1989) (holding that the NJCFA's "protection is limited to consumers"). Simply put, A&M, as a seller of wholesale services, can not find shelter under the NJCFA's provisions. Consequently, A&M's claim under the NJCFA must fail as a matter of law.

    **C.   Economic Duress**

New Jersey's Supreme Court has noted that there are circumstances "under which economic pressure may invalidate an otherwise enforceable contract." *Continental Bank of Pa. v. Barclay Riding Acad., Inc.,* 93 N.J. 153, 175 (1983). In *Continental Bank,* the court discussed the doctrine of economic duress as it applies to arm's length business transactions, and stated that a party must establish two elements to prove economic duress: "(1) [t]he party alleging economic duress must show that he has been the victim of a wrongful or unlawful act or threat, and (2)

[s]uch act or threat must be one which deprives the victim of his unfettered will." *Id.* at 176 (citing 13 Williston on Contracts, § 1617 at 704 (3d ed.1970)). However, the "decisive factor" in the economic duress analysis is the "wrongfulness of the pressure exerted." *Id.* at 177; *see also Windsor Card Shops, Inc. v. Hallmark Cards, Inc.,* 957 F. Supp. 562, 570 (D.N.J. 1997).

The Court in *Continental Bank* explained that in determining whether a party acted wrongfully, there is not a simple formula to apply, but certain general principles provide guidance:

> Where there is adequacy of consideration, there is generally no duress.... Whenever a party to a contract seeks the best possible terms, there can be no rescission merely upon the grounds of "driving a hard bargain." Merely taking advantage of another's financial difficulty is not duress. Rather, the person alleging financial difficulty must allege that it was contributed to or caused by the one accused of coercion.... Under this rule, the party exerting pressure is scored only for that for which he alone is responsible.

*Continental Bank,* 93 N.J. at 177 (citing Williston, *supra,* § 1617 at 708). Importantly, the fact that one party may have the "upper hand" in negotiations does not necessarily mean that the other party's agreement to a demand constitutes economic duress. *See Windsor Card Shops,* 957 F. Supp. at 570 (no economic duress in debt negotiation even though a creditor may have the "upper hand").

The Court finds that the allegations by Defendants, even if true, do not support A&M's economic duress claim. There are two instances in A&M's counterclaims that could be characterized as demands by Kare: (1) Kare's requests that A&M expand its printing capacity; and (2) Kare's request that A&M reduce its prices. A&M's argument fails because in the first instance A&M does not sufficiently allege that Kare's requests were wrongful, and in the second instance it is unclear whether A&M ever agreed to Kare's demand.

11

In the first instance, A&M argues that Kare's demands were wrongful because Kare "had previously promised to send A&M all the business that A&M could handle, and A&M, in reliance upon this promise, had already invested hundreds of thousands of dollars in order to meet [Kare]'s needs." (Defs.' Br. 16.)  A&M's narrative of Kare's demands, however, read more like contractual stipulations than they do "wrongful" or "unlawful" demands.  As detailed above, A&M alleges that on two separate occasions, in 2006 and 2007, Kare requested that A&M increase its printing capacity to meet Kare's growing business needs.  (Defs.' Countercl. ¶¶ 23, 28.)  On both occasions, Kare allegedly promised A&M that A&M's own business would prosper as a result of the expansion of its facilities.  (*Id.* ¶¶ 23, 30.)  Furthermore, A&M claims that on each occasion, "in direct reliance upon Kare's promises and representations," A&M increased its printing capacity.  (*Id.* ¶¶ 25, 31.)  As a result, "Kare continued to increase A&M's printing business by sending them virtually all of their non-California printing business.  *In turn*, A&M devoted virtually all of their printing business to servicing Kare's needs."  (*Id.* ¶ 33) (emphasis added).  A&M does not paint a picture of duress.  Instead, Kare's requests and A&M's assent represent a bargained for exchange with adequate consideration.  A&M agreed to Kare's requests because Kare promised A&M increased business not because A&M had no other choice.  *See*, *e.g.*, *Continental Bank,* 93 N.J. at 177; *Campbell Soup Co. v. Desatnick*, 58 F. Supp. 2d 477, 492 (D.N.J. 1999) ("where there is adequacy of consideration, there is generally no duress").  A&M, as a sophisticated party to a business transaction, was capable of mitigating any potential damages from its relationship with Kare, through negotiation of its contract and/or memorializing, in writing, any terms contained therein.  Tellingly, according to A&M's counterclaim, both parties benefited for over four years as a result of A&M's assent to these "demands".  A&M can not now claim economic duress just because things went sour.[4]

---

[4] A&M has also brought breach of contract and promissory estoppel claims against Kare based upon the same

In the second instance, A&M claims that, in February 2009, Kare demanded that A&M reduce its prices. It is unclear, however, whether A&M ever agreed to this demand. Assent by the complaining party is a necessary requirement to support a claim for economic duress. *See Woodside Homes, Inc. v. Morristown*, 26 N.J. 529, 544 (1958) (holding that a claim for economic duress requires "assent by one party to an improper or wrongful demand"). A&M's allegations relating to this second instance, as currently presented, do not support a claim for economic duress. A&M alleges that after Kare demanded that A&M reduce its prices, A&M "*attempted* to negotiate a better pricing structure." (Defs.' Countercl. ¶ 38.) (emphasis added) A&M, however, never clearly states that it assented or actually reduced its prices consistent with Kare's demand. Instead, A&M's best evidence of its assent is that A&M advised Kare that it "could *not continue* to operate pursuant to the *proposed* price structure." (*Id*. ¶ 39) (emphasis added). A&M fails to clearly and unequivocally allege that it agreed to Kare's request and the Court refuses to speculate. If A&M did agree to institute a new price structure, the Court will grant leave to amend its countercomplaint to state as much.

## II.    Defendants' Motion to Dismiss Claims against Individual Defendants

Defendants assert that all of Plaintiff's claims against the Individual Defendants should be dismissed because Plaintiff has failed to pierce the corporate veil or allege specific misconduct by the Individual Defendants. A&M argues that a corporation is separate from its shareholders, and that "a primary reason for incorporation is the insulation of shareholders from the liabilities of the corporate enterprises." (Defs.' Br. 7 citing *State Dep't. of Envtl. Prot. v. Ventron Corp.*, 94 N.J. 473, 500 (1983).) In order to state a cognizable claim for piercing the

---

conduct it now argues constitutes economic duress (Kare's alleged breach of its promise to use A&M as its printer). It is inconsistent, however, for A&M, on the one hand, to frame its decision to increase its printing capacity as an *obligation* under its contract with Kare, but on the other hand argue that the same obligation was also a *wrongful demand* constituting economic duress. In this case, the concepts are mutually exclusive.

corporate veil, a plaintiff must show that: (1) the corporation is organized and operated as a mere instrumentality of a shareholder, (2) the shareholder uses the corporation to commit fraud, injustice or circumvent the law, and (3) the shareholder fails to maintain the corporate identity. *Bd. of Tr. of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 171-72 (3d Cir. 2002). Defendants argue that Plaintiff has failed to plead any of the requisite elements to pierce the corporate veil. (*See* Defs.' Br. 6-9.)

Significantly, Plaintiff's claims against the Individual Defendants arise from Aaron and Steinberg's own conduct related to their relationship with Kare, and not from the Individual Defendants' position as the principal owners of A&M Cards. As such, the Individual Defendants may not use the fact that their allegedly tortious conduct was performed on behalf of a corporate entity to shield themselves from liability for their own acts. Kare has only brought claims against Aaron and Steinberg for conversion, tortious interference, fraud and unjust enrichment and has not included the Individual Defendants as defendants on any of its non-tort claims. It is well settled law in New Jersey and this Circuit that a corporate officer can be held individually liable for his or her intentional torts without the need to pierce the corporate veil. *See Ballinger v. Delaware River Port Auth.,* 172 N.J. 586, 608 (2002) (individual employees of DRPA were subject to liability for wrongful discharge); *U.S. ex rel. Haskins v. Omega Institute, Inc.*, 11 F. Supp. 2d 555 (D.N.J. 1998) (allowing fraud claim against corporate officers); *Borecki v. Easter Int'l Mgm't Corp.,* 694 F. Supp. 47, 59-60 (D.N.J. 1988) (an agent is liable for his tortious acts, even if his principal is also liable); *Sunset Financial Resources, Inc. v. Redevelopment Group V, LLC*, 2006 WL 3675384, at *3-6 (D.N.J. Dec. 12, 2006) (denying defendants' motion to strike individual owner as defendant and holding that owner could be held personally liable for tortious conduct). According to the New Jersey Supreme Court, such a conclusion "comports with the

long-standing rule that '[a]n agent who does an act otherwise a tort is not relieved from liability but for the fact that he acted at the command of the principal or on account of the principal." *Ballinger,* 172 N.J. at 608 (citing *Restatement (Second) of Agency* § 343 (1958)).

In *Donsco, Inc. v. Casper Corp.,* 587 F.2d 602, 606 (3d Cir. 1978), the Third Circuit Court of Appeals addressed an argument similar to the one now advanced by Defendants. In *Donsco,* the plaintiff brought an unfair competition action against Casper Corporation and its officer Casper Pinsker, individually. *Id.* The Third Circuit held that: "[a] corporate officer is individually liable for the torts he personally commits and cannot shield himself behind a corporation when he is an actual participant in the tort." *Id*. "The fact that an officer is acting for a corporation also may make the corporation vicariously or secondarily liable under the doctrine of respondeat superior; however, it does not relieve the individual of his responsibility." *Id*.

Defendants also argue that the FAC is "woefully deficient in setting forth any factual allegations or sustainable causes of action against them." (Defs.' Br. 6.) In support of their argument, Defendants point out that the Individual Defendants are only specifically mentioned in three paragraphs of the FAC and that none of the conduct alleged, therein, constitutes actionable misconduct. In response, Plaintiff argues that their definition of "Defendants" specifically includes the Individual Defendants (as well as A&M Cards) and is used throughout the FAC to describe all of the Defendants' tortious activities. (Pl.'s Mem. of Law in Opp'n to Defs.' Mot. to Dismiss 3 (hereinafter "Pl.'s Opp'n").)[5] The Court notes Defendants' concern regarding the fact that few, if any, of the allegations specifically mention Aaron and Steinberg by name; however, Defendants' objection is a matter of form over substance. At this early stage, the Court is

---

[5] Plaintiff also argues that A&M is a small, privately held corporation run by the Individual Defendants and thus Aaron and Steinberg were personally responsible for all of the company's actions, including the tortious conduct listed in the FAC. (Pl.'s Opp'n 3.) These facts do not appear in the FAC and are matters outside the pleadings which the court will not consider.

15

satisfied that the definition of "Defendants", contained within the FAC, encompasses the Individual Defendants and that the allegations contained therein were also meant to be applied to Aaron and Steinberg. Thus the Court holds that the allegations made against the "Defendants" pertaining to Plaintiff's tort claims are attributable to the Individual Defendants, as well. A&M does not formally attack Plaintiff's tort claims on any other grounds. Consequently, Defendants' Motion to Dismiss the claims against the Individual Defendants is denied.

### III.     Plaintiffs' Motion to Strike Individual Defendants' from Counterclaims

Plaintiff argues that A&M fails to allege that either of the Individual Defendants have tort claims against or have personally contracted with Kare. Kare, however, can not have it both ways. It is inconsistent for Kare, in its Opposition to Defendants' Motion to Dismiss, to argue that the claims against the Individual Defendants are proper because Aaron and Steinberg were personally responsible for all of the company's actions but then in its Motion to Strike argue that the Individual Defendants do not have the requisite nexus, to Kare and A&M's relationship, to bring counterclaims (*See* Pl.'s Opp'n 3.; and Pl.'s Mem. of Law in Supp. of Partial Mot. to Strike 7). On a Motion to Dismiss, the Court must "construe the complaint in the light most favorable to the Plaintiff, and determine whether, under any reasonable reading of the complaint, the Plaintiff may be entitled to relief." *Phillips v. County of Allegheny,* 515 F.3d 224, 231 (3d Cir. 2008). Accordingly, Kare's motion to strike the Individual Defendants as counterclaimants is denied.

### CONCLUSION

For the reasons stated above, Defendants' Motion to Dismiss the Complaint as to the Individual Defendants is DENIED. Plaintiff's Motion to Dismiss Defendants' Counterclaims for fraudulent inducement and violation of the New Jersey Consumer Fraud Act is GRANTED.

Plaintiff's Motion to Strike the Individual Defendants as counterclaimants and Plaintiff's Motion to dismiss Defendants' Counterclaim for economic duress are DENIED.  Defendants are granted leave to amend their claim for economic duress for the limited purpose of detailing the circumstances under which they agreed to Kare's request to lower their prices.  Leave is not granted for either party to amend portions of the FAC or Counterclaims not addressed in this Opinion.  Nor may either party add additional causes of action or new theories of liability without further leave from the Court.


**SO ORDERED.**

s/ Susan D. Wigenton
**Susan D. Wigenton, U.S.D.J.**

cc:  Madeline Cox Arleo, U.S.M.J.